TINDEL–MORRIS CO. v. CHESTER FORGING & ENGINEERING CO.

(Circuit Court, E. D. Pennsylvania. August 7, 1908.)

No. 9, October Sessions, 1907.

1. PATENTS—SUIT FOR INFRINGEMENT—PRELIMINARY INJUNCTION.

A court of equity may enjoin a threatened infringement of a patent, although no act of infringement had been committed when the bill was filed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, §§ 478, 479.]

2. SAME—INFRINGEMENT—PURCHASER OF PARTS OF MACHINE—RIGHT TO USE.

A sale of a patented machine by one authorized to sell vests the purchaser with an absolute title and the right of user, but a sale of the parts of a dismantled machine as scrap iron does not pass title to the machine, nor the right to use it, and if the parts are reassembled, and the machine used, such use is an infringement of the patent.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 399.]

3. SAME—INJUNCTION—MACHINE OBTAINED BY FRAUD.

Defendants, two of whom were then employés of complainant, one being its foreman, organized a company to engage in a competing business in the making of crank shafts. Before the foreman left complainant's employment, it sold a quantity of scrap iron to a junk dealer and, among other things taken by him, were the parts of two dismembered crank shaft lathes covered by patents owned by complainant. Such parts were not knowingly sold by complainant, were stored in a different place from the scrap, and there was evidence that they were loaded in the junk wagon at the instance of the foreman. He or his codefendant picked the parts of the machines from the scrap and purchased them from the junkman for $100, their value being at least $1,500, and they were proceeding to reassemble them preparatory to operating the machines. Held, that the evidence was sufficient to show that they were obtained from complainant

by fraud, and that a preliminary injunction would be granted restraining defendants from using the machines, regardless of the question of the validity of the patents.

In Equity. On motion for preliminary injunction.

Frank P. Prichard, for complainants.

E. Hayward Fairbanks, for defendants.

ARCHBALD, District Judge.[1] This is a bill to enjoin the use of two patented machines for the turning of crank shafts which formerly belonged to the complainants, but of which the defendants, as it is charged, have obtained unlawful, if not fraudulent, possession. The defendants have demurred, on the ground that, infringement being the basis of the bill, no infringing act had been committed at the time it was filed; the different parts of the machines, which came into their hands in a dismembered condition, not having as yet been completely put together. But the possession being unlawful, as the demurrer admits, and the purpose to use the machines after they have been completed not being denied, the threatened use may be enjoined without awaiting its accomplishment. Page Woven Wire Fence Co. v. Land (C. C.) 49 Fed. 936; National Meter Co. v. Thomson Meter Co. (C. C.) 106 Fed. 531; Adair v. Young, 12 Chanc. Div. 13. The wrong is imminent, and the court is not so powerless as to have to let it go on and be carried out, before interfering. Vicksburg Waterworks v. Vicksburg, 185 U. S. 65, 22 Sup. Ct. 585, 46 L. Ed. 808.

Turning, then, to the merits, the facts disclosed by the affidavits are considerably out of the ordinary. The defendant company was organized early in 1907, as a rival of the complainants in the crank shaft business, by two men, Tomkins and Arnhold, who were in their employ; Witteman, the third member, being taken in to complete the company. When this was discovered by the complainants, Tomkins and Arnhold were discharged; Arnhold, who was foreman of the shop, being retained till the end of the month to close up certain matters. The latter part of February, while he was still in charge, the complainants had occasion to sell some old hack saws to a junk dealer, who was also asked to make an offer for the cast iron scrap scattered around in piles, which he did after looking it over. There were stored away at the time, on a platform over the warehouse, in a place provided for unused machinery, the complete parts of two dismantled crank lathes, made under the patents held by the complainants, which were somewhat out of order, by reason of wear, but were capable, with slight repairs, of being put in an operative condition. Some of these parts were of steel, with phosphor bronze bushings, and under no circumstances would be classed as scrap; nor were any of them in the scrap piles examined by and sold to the junkman. In some unexplained way, however, they were taken down from the place where they were stored and loaded up and carted off with the scrap in the junk wagons. There is evidence that this was by the direction of Arnhold, but it is denied by him, although it certainly was done under his supervision, of which more presently. With-

[1] Specially assigned.

163 F.—20

in a day or two afterwards, the junk dealer was notified, by telephone either by Tomkins or Arnhold, he is not sure which, that they would come and look over the scrap, and might want to select some things out of it. This they did, taking the different parts of the two crank lathes in question, for which they paid him $100, directing them to be hauled to the shop of the defendant company. As scrap, this material had cost the junk dealer $18 a ton; the whole amount paid by him being some $37. As machinery, it was worth at least $1,500. Since coming into the hands of the defendant company, the lathes have been put together, suitable bed plates constructed, and other parts supplied to put them in complete running order. None of this latter is covered· by the complainants' patents, but the machines, as so assembled and set up, are admittedly within and infringe upon them, unless, under the circumstances, the defendants have acquired the right to use them.

The purchaser of a patented article, from one who is authorized to sell, becomes possessed of an absolute property in it (Keeler v. Standard Folding Bed Co., 157 U. S. 659, 15 Sup. Ct. 738, 39 L. Ed. 848), which he is capable also of transmitting to others, provided, of course, there are no express restrictions. Dickerson v. Tinling, 84 Fed. 192, 28 C. C. A. 139. Had therefore the machines which are in controversy here been advisedly sold to the junkman, he in turn could have sold them, as he did, to Tomkins or to Tomkins and Arnhold, and the defendant company, buying from them, would undoubtedly have been protected. The complainants having parted with them in this way, if that was the fact, the right of property which thereby passed would have carried with it, as of course, the right of user. But it is manifest that, to have this effect, the sale must have been actually intended, and it must have been of the machines as such, and not of the dismantled parts as scrap. A sale as scrap was a sale, not to use, but to destroy, and cannot be wrested into a sale of the patented machines, because the different parts could be picked up and put together out of it. Wortendyke v. White, 2 Ban. & Ard. 25; Cotton-Tie Co. v. Simmons, 106 U. S. 89, 1 Sup. Ct. 52, 27 L. Ed. 79. Even assuming, then, that there was no fraud, and that the patented parts were merely included by mistake in the scrap that was sold to the junkman, this would give no authority to him, or to any one buying from him, to rig them up into a machine in disregard of the patents.

So far the case has been considered as though the sale were a fair one; but the evidence goes further and justifies the conclusion that it·was not fair, but fraudulent, and the complainants are entitled to press this point, as it dispenses with the necessity for passing upon the validity of the patents, which otherwise might have to be gone into. That the complete parts of the two machines were included in the scrap hauled off by the junkman, not only with the acquiescence, but with the connivance, of Arnhold, there can be little question. Being foreman of·the shop, if there was nothing else, it is not to be believed that they could be brought out from where they were stored and carted away, without his knowing it. But, more than this, we have the testimony of Cash, who was employed there at the time, that Arnhold was present during the loading, and told him that he had orders from the firm to get this material out of the way because it

was a nuisance up there on the platform, a statement which apparently had not a word of truth in it, and Pylant, another workman, swears that, by the direction of Arnhold, as he thinks, although he cannot be positive, he took down the machines and helped to load them; Arnhold being present and telling him to handle them carefully, as they were going to be used again; while Griffiths, the shipping clerk, who usually tended to such matters, says that the shop order to deliver this scrap covered only that which was piled in the yard, and that the machines, as he subsequently learned, were loaded on the first wagon that went off, when he was temporarily absent. It is charged that Townsend, the superintendent, and Crispin, assistant secretary, inspected the piles and knew that they contained this machinery; but that is denied, and is merely stated on information and belief, there not being a particle of evidence to substantiate it. Indeed, if they had, it is not credible that they would have stood by and allowed unbroken steel parts, with phosphor bronze bushings, to go as cast iron scrap, and, on the other hand, if this was done by Arnhold, as is proven, it is difficult to resist the conclusion, in view of the sequel, that it was done with a purpose; it being very peculiar, also, that two entire machines, with all the minor parts complete, should afterwards be able to be picked out from the scrap of which he had supervised the loading.

The next thing is that Birtwell, the junkman, within a day or two after the purchase, gets a telephone message from Tomkins or Arnhold—it does not matter which, except that, if it was Tomkins, it is all the more damaging, because he must have been in communication with Arnhold—to the effect that they would call and look over the scrap, which they did, selecting out what they wanted, for which they paid him $100, for what was worth $1,500. Before this, however, or possibly afterwards (it is not clear which, although, if it was afterwards, it is difficult to see why it is brought in here, because the advice of counsel after the fact is of no significance), Tomkins, as he says, and Witteman also, for that matter (they both seem anxious that the company should proceed on an approved legal basis), took counsel and was advised that he had a right to buy these machines of Birtwell, as he did, and that the company, in acquiring title through him, would be entitled to set them up and use them. If this occurred before he bought, it needs no comment. If afterwards—being apparently before any controversy had arisen—it is a confession of sensible weakness, for if he knew nothing of how the machines got into the hands of the junkman, and had no reason to doubt the validity or good faith of the transaction, why did he need to have any such legal assurance with regard to it? Putting all these things together, and without lingering longer over them, there is but one reasonable conclusion to be drawn, and that is that the defendants proposed, in the words of Arnhold, "to steal a march on Tindel," who would not sell the machines—of which, by the way, Arnhold claims that he, and not Tindel and Albrecht, is the real inventor, which may have something to do with his conduct—trusting to their ability to hold and use them, once they got them into their possession. Equity will see, however, that this is not successful, for whatever title passed to the dis-

membered parts as scrap, by virtue of the sale to the junkman, having now got into the hands of those who concocted the scheme, it is against all conscience that they should be allowed to carry it out or get the fruits of it.　As to them, the rights of the complainants remain as at the start, unaffected by the motions which have been gone through with, which the fraud vitiates, and this is the case, patents or no patents, dispensing with the necessity for going into the question of their validity, which is raised, or requiring it to be first adjudicated or acquiesced in, according to the ordinary rule which prevails in applications of this kind.

The complainants having thus shown themselves clearly entitled to the relief asked, an injunction to restrain the use of the machines in question will issue, and it is so ordered.