### AMERICAN LECITHIN CO. v. J. C. FERGUSON MFG. WORKS, Inc.

#### No. 530.

District Court, D. Rhode Island.

April 27, 1937.

Frank H. Swan and Eugene J. Phillips, both of Providence, R. I., for plaintiff.

Ira Lloyd Letts, of Providence, R. I., for defendant.

MAHONEY, District Judge.

The American Lecithin Company has brought this suit to enjoin contributory infringement by J. C. Ferguson Manufacturing Works, Inc., for an accounting of profits, and for damages. It involves the alleged contributory infringement of United States letters patent No. 1,781,672, issued November 11, 1930, to Earl B. Working on application filed July 16, 1930. The complainant corporation owns the patent by assignment. The specification recites that:

"The alleged invention relates to confectionery and in particular has reference to improving chocolate or other material usually containing a large percentage of cocoa butter, including mixtures of chocolate with added cocoa butter and mixtures of cocoa or chocolate with added fats from other sources, such as are sometimes useful in the confectionery industry, whereby the stability of the resulting product is improved."

The patent in this case has to do with the chocolate industry in the making of chocolate bars and chocolate coatings which are used by candy manufacturers.

The source of chocolate is the cocoa bean. From a process of roasting and pressing there is developed from the cocoa bean what is known as bitter chocolate, or chocolate liquor. When the temperature is reduced to normal temperature, this solidifies and is then known as "bitter chocolate." As such it is the basis of the chocolate industry. When mixed with sugar it is known as "sweet chocolate"; when mixed with milk it is known as "milk chocolate." The bitter chocolate contains a fat which is cocoa butter.

In the making of bar chocolate and chocolate coatings for candy, there is usually added to the bitter chocolate or chocolate liquor an additional amount of cocoa butter, and in the manufacturing of chocolate there has been considerable difficulty in the making of bar chocolate and coatings for candy. During the making of chocolate for bar use or for coatings, the chocolate, under some conditions, turns gray. It also turns gray on the shelves and in the windows of the retailers. This has long been recognized by the chocolate trade as undesirable.

The graying may be caused by improper cooling or by some other incident in the manufacture. It is well understood in the chocolate trade that the cocoa butter comes to the surface and causes graying. There are many other different suggestions as to the real cause of it. In the manufacture, if the chocolate is not of the proper fluidity or viscosity, it may turn gray in the making, and it may not allow an even distribution of the chocolate over the chocolate drop. To get the proper fluidity, additional cocoa butter is used and right at that point the graying may arise.

Many attempts have been made to overcome such difficulties. Gums and starches have been added to stabilize the cocoa butter and to prevent graying and at the same time to get the proper fluidity more cocoa butter must be added.

Lecithin is a natural product. It is a phosphatid. It is found in eggs and in vegetable life and in other bodies. It is also extracted from the soya bean.

This patent covers the method and the result of the method of adding lecithin to the chocolate.

In the making of chocolate for coatings or bar chocolate, there is added to the bit-

ter chocolate an optimum amount of lecithin, in accordance with the directions in the patent. This brings about a reduction in the cocoa butter content because the lecithin brings the proper fluidity without the addition of cocoa butter. This addition of an optimum amount of lecithin retards the time of graying. It does not prevent graying. By the use of this added lecithin in the making of chocolate there is a greater tolerance in the times and in the temperature.

Because lecithin contained phosphatids it had been used principally in connection with health foods in Europe. Attempts had been made to use it in certain articles of food in this country, but they were not followed out. It is maintained that from the experimental work of the patentee came this patent for the use of lecithin in chocolate manufacturing.

The complainant maintains that the chocolate industry did not respond at once to the suggestions made in the patent, and that it has been compelled to expend much time and money in educating the industry in such use. Until now, complainant says, there is almost a general adoption of this use of lecithin and much of it has been sold.

The patent has thirteen claims of which claims numbered 3, 8, and 13 are distinctly involved. The claims are as follows:

"1. A chocolate mass adapted for coating cores of confectionery, comprising chocolate and a small percentage of added lecithin, the percentage of lecithin being sufficient to at least retard 'graying.'

"2. A chocolate mass adapted for coating cores of confectionery, comprising chocolate and a small percentage of added lecithin, the percentage of lecithin being sufficient to enable the fatty constituents of the mass to be reduced below the amounts heretofore commonly employed, while the viscosity and covering power of the mass are still substantially as good as in the masses heretofore commonly used.

"3. In the art of making confectionery, the herein described improvement which comprises incorporating, at any stage of the manufacture, with confectionery material including chocolate carrying such amounts of fatty material as to be normally subject to 'graying,' a sufficient percentage of lecithin to retard 'graying.'

"4. A new material in the confection industry, comprising a chocolate composition suitable for coating candy cores, and containing about 0.1 to 0.5% of lecithin, cores coated with such product being less subject to 'graying' at high atmospheric temperature than is ordinary chocolate coating.

"5. A chocolate mass having a consistency and melting point suitable for coating confections, containing a small percentage of lecithin, and containing less than the usual content of cocoa butter and similar fats.

"6. A chocolate mass having a consistency and melting point suitable for coating candy cores, cakes and the like, containing not substantially over 1% of lecithin, such product having a substantially greater tolerance towards water than has ordinary chocolate coating mass.

"7. In making chocolate confections, the step of incorporating with a chocolate coating material which, by itself, applied as a coating would be liable to 'graying,' an amount of lecithin sufficient to reduce such 'graying' tendency and coating confectionery cores with such material.

"8. A chocolate coating mass which contains a smaller amount of fat than that normally required for satisfactory dipping, and an amount of lecithin sufficient to impart a sufficient degree of fluidity thereto, to make it satisfactory for application as a coating, by dipping.

"9. In making chocolate confections, the herein described step of adding a small amount, not substantially over 1%, of lecithin, to a chocolate mass, the amount of lecithin so added being sufficient to reduce the 'graying' tendency.

"10. A chocolate confection comprising chocolate containing a small amount, not substantially over 1%, of lecithin, such product having substantially less tendency to 'graying' than do similar products containing ordinary chocolate without the lecithin.

"11. As a new material in the chocolate confectionery industry, a chocolate mass containing about 0.2% to 0.3% of added lecithin, such lecithin being sufficient to retard 'graying,' to a substantial extent.

"12. In the manufacture of chocolate mass, the steps of reducing the content of cocoa butter and similar fatty material substantially below normal, and adding about 0.2% to 0.3% of lecithin, sufficient to impart to the mixture the necessary workability of the chocolate mass for coating by dipping, whereby the tolerance of the mass

to water is substantially improved, and its sensitivity to variation in running temperatures is decreased.

"13. In the preparation of chocolate mass, the step of adding, at any stage of the manufacture, about 0.2% to 0.3% of lecithin whereby 'graying' of the finished chocolate product is at least retarded."

The complainant charges the respondent with contributory infringement on its patent by the sale and threatened sale of lecithin to chocolate manufacturers who have used, or are about to use the patented process in manufacture, with knowledge and intention of its use in the patented process.

The respondent denied the validity of the patent, and alleged anticipation of the invention described in the patent by a number of patents and publications in other countries and in this country. It further alleged that Working was not the first inventor of the invention. It also alleges as a defense that the complainant has come into court with "unclean hands" and bases this defense upon the allegation in its answer that said complainant has been licensing manufacturers of chocolate upon the condition that lecithin used in the patented process be purchased only from complainant.

It states that the complainant is guilty of unfair competition because of its allegedly false representations made to the chocolate trade, and in this connection the respondent also sets up a counterclaim based on an alleged violation by the complainant of the provisions of the Clayton Act (sections 1, 3, 4) and of the Sherman Anti-Trust Act (sections 1–3, 8), 15 U.S.C.A. §§ 1, 2, 3, 7, 12, 14 and 15.

The facts and conclusions appearing herein may be adopted as findings of fact and conclusions of law.

The validity of the patent is the first question to be determined.

The rights of the patentee are based on statute. 35 U.S.C.A. § 31. In the case of Kwik-Set v. Welch Grape Juice Co. (D. C.) 14 F.Supp. 137, at page 140, the court stated that: "A presumption of validity arises from the issuance of the patent. 'The patent is prima facie evidence of both novelty and utility.'" The authorities which hold that one who denies such validity has the burden of sustaining his denial by proof beyond a reasonable doubt are so abundant that they need not be cited.

In Skelly Oil Co. v. Universal Oil Products Co. (C.C.A.) 31 F.(2d) 427, at page 431, it is held that:

"Inferences as distinguished from disclosures, especially when drawn in the light of after events, cannot be accepted as a basis of anticipation.

"A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit. Otto v. Linford, 46 L. T.(N.S.) 35, 44. It is not enough to prove that a method or apparatus described in an earlier specification can be made to produce this or that result. Flour Oxidizing Co. v. Carr & Co., 35 R.P.C. 457. A singularly sensible test of the rule of anticipation is given in British Thomson-Houston Co. v. Metropolitan Vickers Electrical Co., 45 R. P.C. 22, by asking the question—'Would a man who was grappling with the problem solved by the patent attacked, and having no knowledge of that patent, if he had had the alleged anticipation in his hand, have said: "That gives me what I wish?"' The Pope Alliance Corporation v. The Spanish River Pulp & Paper Mills, Ltd. (Privy Council Appeals No. 33 of 1928)."

It is with this understanding that the anticipation relied upon by the respondent in the prior patents, publications, prior use, and prior knowledge and state of the art, put in evidence by the respondent, must be determined.

In 1927 there was published in Berlin "Hager's Handbuch der Pharmazeutischen Proxis," second volume, p. 80, respondent's Exhibit F. Merck was a drug concern in Germany, and there is a reference in this book entitled "Merck's Lecithin Preparation" wherein it is recited that: "The following preparations are found in commerce: Lecithin chocolate (lecithin granulatum), a 10-per cent trituration of lecithin, cacao and sugar. Also in the form of small cakes of chocolate, each containing 0.25 gram of lecithin. Lecithin candy or bonbons, containing 0.25 gram lecithin each. Lecithin tablets, coated, containing each 0.025 and 0.05 gram lecithin. Lecithin emulsion with a 10-per cent content of lecithin in a physiological common salt solution, supplied in ampouls of 2 com$^3$ and 5 com$^3$ (for subcutaneous or intramuscular injections) * * *" This publication distinctly has to do with lecithin for its medic-

inal value in the preparations put out by a drug company.

The British patent No. 1874, respondent's Exhibit H, sets forth a claim of "Egg chocolate composition consisting of a suitable mixture of torrefied and decorticated cacao; dried milk, dried yolk of egg, agar-agar and sugar." This is dated 1914, and there is nothing herein which demonstrates that the egg yolk contained lecithin or which stresses the importance of the presence of lecithin. It suggests the use of certain substitutes for granulated and concentrated Japanese seaweed mixed with chocolate. It does not demonstrate in any way how egg yolk might retard graying or affect viscosity. It has to do with pharmaceutical preparations. It contains no reference to the manufacturing of chocolate.

The respondent offers, as its Exhibit I, patent No. 1,150,691 from the United States Patent Office. The invention described in this patent "relates to a food stuff containing lecithin in a form in which it will readily be absorbed and assimilated and to the method of preparing such a material." The lecithin "is obtained from the eggs or other raw materials in as pure a state as possible and is then mixed with suitable vehicles such as biscuit powder, chocolate, sugar or the like." This has no relation to the chocolate industry. It is "a foodstuff containing a dry mixture of egg yolk in which the whole of the lecithin is in a free state and a body-building vehicle."

Respondent's Exhibit J, patent No. 1,-277,336, provides for the production of "an emulsion which completely replaces egg yolk, in that it shows the same results in baking and cooking as natural egg yolk, and also possesses an equal food value. There can also be added to the emulsion some lecithin." This does not suggest in any way the retarding of graying or control of viscosity in the manufacture of chocolate.

United States patent No. 1,660,541, respondent's Exhibit X, and Bollman's British patent, respondent's Exhibit R, describe the addition of lecithin to cocoa powder. Cocoa powder is a low fat product and the addition of 2 per cent. of lecithin brings about a different result from the addition of lecithin in smaller amounts to chocolate, a higher fat product.

An examination of the other patents and publications put in as exhibits by the respondent to reveal the prior art, knowledge and use, demonstrate in fact that no useful knowledge to the chocolate industry and no commercial use in that industry were obtained therefrom.

In A. S. Boyle Co. v. Harris-Thomas Co. (D.C.) 18 F.Supp. 177, 179, the court said:

"The defendant has put in evidence 85 patents and several excerpts from textbooks and publications. Perhaps it is not true that many of the patents are merely paper patents, but in other respects what was said by the Circuit Court of Appeals in Naylor v. Alsop Process Company, 168 F. 911, 917, might be repeated here. In that case the court said:

" 'Defendants have ransacked patent offices in America and Europe, and brought together a formidable collection of patents. Many of them are paper patents, and others relate to remote arts. Piecing together excerpts and elements from this wide search, they have built up a formidable speculative argument to show how simple and easy was the step taken by Andrews. This is a form of argumentation familiar in patent litigation. Though it seldom succeeds, it is often the only recourse of the infringer. The patent law, however, has its proper place in the realm of actual industrial life, and not in the limboes of parchment casuistry. The merit of a patent is to be determined, not by its standing in dialectics, but by the actual effects in the art to which it belongs.' "

But it is argued that the prior patents, publications, and use show that there is no invention in this case and that the knowledge herein employed was already well known and therefore not patentable.

In Webster Loom Company v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177, the Supreme Court says:

"But it is plain, from the evidence and from the very fact that it was not sooner adopted and used, that it did not, for years, occur in this light to even the most skillful persons. It may have been under their very eyes, they may almost be said to have stumbled over it; but they certainly failed to see it, to estimate its value and to bring it into notice. Who was the first to see it, to understand its value, to give it shape and form, to bring it into notice and urge its adoption, is a question to which we shall shortly give our attention. At this point we are constrained to say that we cannot yield our assent to the argument that the combination of the different parts or elements for attaining the object in view was so obvious as to merit no title to invention.

Now that it has succeeded, it may seem very plain to anyone that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention."

Moreover, the respondent urges that the patentee was not the inventor, but that others were. It is not established in this case that others were the inventors. The respondent says that the patentee knew nothing about the chocolate industry; that he had had no experience in the manufacture of confectionery; and that Working obtained his result in the ordinary course of laboratory experiment. It is said in A. S. Boyle Co. v. Harris-Thomas Co., supra, that:

"There is nothing in this to make it any the less an invention. The patent laws do not insist upon anything dramatic in the discoveries which they protect. An invention may be patentable, although it is 'the result of experiment and not the instant and perfect product of inventive power. A patentee may be baldly empirical, seeing nothing beyond his experiments and the result; yet if he has added a new and valuable article to the world's utilities, he is entitled to the rank and protection of an inventor.'"

The court in Graham Paper Co. v. International Paper Co. (C.C.A.) 46 F.(2d) 881, 885, said:

"Were there any doubt as to the validity of this patent, the presumptions from commercial success, from the fact of its issuance, and the rule that one attacking the validity of a patent must do so with reasonable clearness, would be sufficient to save it."

The respondent, in denying the validity of the patent, has not maintained its denial with the burden of proof necessary. The patent has novelty and utility.

The conclusion is that the patent in suit is valid.

Is the respondent guilty of contributory infringement?

An examination of the exhibits presented by the complainant reveals various letters which show the relation of the respondent to the chocolate manufacturers. This evidence clearly shows that the respondent sold lecithin to such manufacturers and solicited orders for this product from them with the intent of aiding them in the unlawful using of the patented invention.

In Goodyear Shoe Machinery Co. v. Jackson (C.C.A.) 112 F. 146, 148, 55 L.R.A. 692, the court held that "Contributory infringement is 'the intentional aiding of one person by another in the unlawful making or selling or using of the patented invention'; and this is usually done by making or selling a part of the patented invention with the intent and purpose of so aiding. The essence of contributory infringement lies in concerting or planning with others in an unlawful invasion of the patentee's rights." Authorities cited.

The court in Westinghouse Electric & Mfg. Co. v. Precise Mfg. Corporation (C.C.A.) 11 F.(2d) 209, 211, says that:

"Many valuable patents are combinations of unpatentable elements. By furnishing parts it makes it possible for others to assemble and use the combination, and when a manufacturer, by so manufacturing and advertising, points out the way in which this can be done, and thus, intentionally so acting, promote infringements of patentee's rights, he becomes a contributory infringer. Thomson-Houston Electric Co. v. Ohio Brass Co., 80 F. 712, 26 C.C.A. 107. A device capable of an infringing use, and sold with the intent that it shall be so used, is an infringement of the patent, even though the same device is capable of a noninfringing use, and even though there may be a form of instructions that it shall be used in noninfringing way. Sandusky Foundry & Machine Co. v. De Lavaud (C. C.A.) 274 F. 607. But where, as here, it appears that each of the appellants manufactured with knowledge of the contemplated infringement, contributory infringement is clear. Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 325, 29 S.Ct. 503, 53 L.Ed. 816; Individual Drinking Cup Co. v. Errett (C.C.A.) 297 F. 733."

In Thomson-Houston Electric Co. v. Ohio Brass Co. (C.C.A.) 80 F. 712, 721, the court states that:

"Many of the most valuable patents are combinations of nonpatentable elements, and the only effective mode of preventing infringement is by suits against those who, by furnishing the parts which distinguish the combination, make it possible for others to assemble and use the combination, and who, by advertisement of the sale of such parts and otherwise, intentionally solicit and pro-

mote such invasions of the patentee's rights."

Leeds & Catlin Company v. Victor Talking Machine Company, 213 U.S. 325, 332, 29 S.Ct. 503, 505, 53 L.Ed. 816, holds that:

"A combination is a composition of elements, some of which may be old and others new, or all old or all new. It is, however, the combination that is the invention, and is as much a unit in contemplation of law as a single or noncomposite instrument. Whoever uses it without permission is an infringer of it. Whoever contributes to such use is an infringer of it. It may be well here to get rid of a misleading consideration. It can make no difference as to the infringement or noninfringement of a combination that one of its elements or all of its elements are unpatented."

It is held in Graham Paper Co. v. International Paper Co., supra, that the

"Defendant contends there could be no contributory infringement apart from a direct infringement. A completed act of infringement is not necessary to afford ground of relief. Threatened infringement is sufficient. Smeet et al. v. Fox Copper & Bronze Co. et al. (C.C.A.) 130 F. 455; Tindel-Morris Co. v. Chester Forging & Engineering Co. (C.C.) 163 F. 304; Chester Forging & Engineering Co. v. Tindel-Morris Co. (C.C.A.) 165 F. 899."

It is clear from the evidence that the respondent knew, through the testimony of its own officer, that certain chocolate manufacturers were infringing the patent in suit, and that others had infringed and would infringe. The respondent was extremely busy in such a field and eagerly sought orders from such manufacturers for the purchase of lecithin from it. It urgently offered this product for sale to be used in the candy manufacture with the patent of the complainant. It sold its lecithin with the intent and purpose that the rights of the owner of the patent were to be invaded. The respondent is guilty of contributory infringement.

█ The notices and warnings which have been issued by the complainant, both to the respondent and to those chocolate and candy manufacturers who might be considered as using or about to use the complainant's patent in violation of its patent rights, are in no way derogatory to the rights of the respondent. These notices and warnings were in good faith; they were not false or malicious; they were not uttered and published for the purpose of destroying the respondent's business; they were not calculated to "injure unnecessarily" the respondent's business. They were sent out by the complainant to protect its right under a valid patent. The complainant was acting within its rights. See Clip Bar Mfg. Co. v. Steel Protected Concrete Co. (D.C.) 209 F. 874; Alliance Securities Co. v. De Vilbiss Mfg. Co. (C.C.A.) 41 F.(2d) 668; Gibson v. Smoot Engineering Corporation (D.C.) 50 F.(2d) 203; Motion Picture Patents Co. v. Eclair Film Co. (D.C.) 208 F. 416; Van Kannel Revolving Door Co. v. American Revolving Door Co. (C.C.A.) 215 F. 582; Oil Conservation Engineering Co. v. Brooks Engineering Co. (C.C.A.) 52 F.(2d) 783. The defense of "unclean hands" is not sustained.

█ The only monopoly appearing here is one based on the rights of the complainant as present owner of the patent. The alleged violation of section 7 of the Sherman Anti-Trust Act (15 U.S.C.A. § 15) and section 3 of the Clayton Act (15 U.S.C.A. § 14) set up in the counterclaim have been stressed for the purpose of supporting the defense of "unclean hands" and unfair competition. Private parties may not maintain suits under the Sherman Anti-Trust Act. Paine Lumber Co. v. Neal, 244 U.S. 459, 37 S.Ct. 718, 61 L.Ed. 1256. The complainant has done nothing which substantially lessens competition or tends to create a monopoly in any line of commerce. The complainant seeks to restrain the sale of lecithin only where it is sold with the intent that it is to be used in conjunction with complainant's patent. As to any other purpose for which lecithin might be used, the complainant has in no way sought a limitation. The controlling force operative under the Clayton Act (15 U.S.C.A. § 14) is not effective in this case.

The complainant has never issued any formal license to any one to use its patent. However, upon the sale of lecithin, or the complainant's trade mark product "Lexin," the complainant acquiesces in the use of its patent. When the lecithin thus sold by the complainant has been used up by the customer this acquiescence ceases, the permissive use of the patent ceases. A customer might well have bought this lecithin from complainant for any other use, but when the complainant sold its lecithin to the chocolate trade, it was expected that the purchasers would use the lecithin in the

manufacture of chocolate in accordance with the patent in suit. When the complainant sells its lecithin, it is not in a position to deny the use of it in its patent for it is sold by it with the intent that it be so used. But this is not a license which has been granted by the complainant upon which a royalty has been paid. It is not a license which has removed the patent from the control of the owner. It is not analogous to a patented article which has been sold and over which the patentee is attempting to exercise further control. And it is not a case of restrictive notices. The sale of lecithin by the complainant with the expectation that it is to be used by a chocolate manufacturer really meant that the use of it would be employed as a necessary part of the invention of its patent. The addition of lecithin as prescribed in the patent is the vital feature of the patent. The addition of lecithin as prescribed contained the vital features of the invention—it "serves to distinguish the invention,—to mark the advance upon the prior art." The added lecithin as specified is a part of the invention.

The case entitled Carbice Corporation v. American Patents Development Corporation, 283 U.S. 27, 51 S.Ct. 334, 336, 75 L.Ed. 819, which has been cited by the respondent as an authority which denies relief to the complainant, is clearly different from the instant case. The court there said: "The case at bar is wholly unlike Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U. S. 325, 333, 29 S.Ct. 503, 53 L.Ed. 816, on which plaintiffs rely. That was an ordinary case of contributory infringement." In that case the container had been sold, and an attempt had been made to control its use in the hands of the purchaser by requiring him to use it only with an unpatented substance. Upon the sale of the container, the patented monopoly in its use ceased. In the instant case the patent has not been sold; no license has been issued; the patent monopoly still attaches to the patent. Hence, it is clear that the Carbice Case did not change the law of contributory infringement, and does not control the instant case. See General Foods Corporation v. Seeman Bros. (D.C.) 60 F.(2d) 622; Bassick Mfg. Co. v. Adams Grease Gun Corporation (C.C.A.) 52 F.(2d) 36; and National Pigments & Chemical Co. v. Shreveport Chemical Co. (D.C.) 1 F.Supp. 417.

The conclusion of the court is that the patent is valid and that the record clearly shows that the respondent is guilty of contributory infringement, and should be enjoined from further infringements. A master may be appointed to ascertain the profits and determine the damages.

A proper decree may be presented.