## AMERICAN LECITHIN CO. v. WARFIELD CO.

### Civil Action No. 1505.

District Court, N. D. Illinois, E. D.

Nov. 10, 1941.

Ira J. Wilson, of Chicago, Ill., and Blair, Curtis & Hayward and John W. Thompson, all of New York City, for plaintiff.

Chritton, Wiles, Davies & Hirschl, of Chicago, Ill. (Charles J. Merriam, of Chicago, Ill., of counsel) for defendant.

BARNES, District Judge.

The plaintiff, American Lecithin Company, as owner of Working Patent No. 1,-781,672, for "chocolate material and method of making same," charged infringement of said patent by the defendant, The Warfield Company, and sought an injunction and accounting. The defendant denied the infringement and charged that the patent is invalid, and in a counter-claim prayed that the patent be adjudged invalid and that the defendant does not infringe any valid claim thereof.

An earlier case between the same parties, charging infringement of the same patent, resulted in a finding and decree by this court that the plaintiff did not come into court with clean hands. 23 F.Supp. 326. This decree was affirmed by the Circuit Court of Appeals for the Seventh Circuit. 105 F.2d 207. Both parties sought to review the judgment of the Circuit Court of Appeals by means of certiorari in the Supreme Court of the United States, and the writs were denied on November 13, 1939. 308 U.S. 609, 60 S.Ct. 175, 84 L.Ed. 509.

The conduct of the plaintiff which in the former suit was held to render its hands unclean was its use of its patent in such a way as to create a monopoly in the unpatented commodity lecithin.

The plaintiff now claims to have ceased the conduct which resulted in the holding of "unclean hands" in the former case. The defendant makes two answers: First, that the conduct of the plaintiff in respect of the defendant was not altered earlier than December 9, 1939, and that the defendant can not be mulcted for infringement of the patent between December 9, 1939, and the date of bringing suit, March 26, 1940; and, Second, that the conduct of the plaintiff generally in respect of licensing or refusing licenses under its patent has continued to create a monopoly in an unpatented commodity. Counsel for the defendant, in its brief, has accurately summarized the conduct of the American Lecithin Company during the pendency of the earlier case in the reviewing courts as follows:

"The Lecithin Company sent out notices during 1938 and 1939 purporting to cleanse its hands. But it went out of its way to prevent any offers from applying to the Warfield Company.

"The alleged offer in the spring of 1936 was obviously a special offer to settle the Warfield case. The offer to the trade did not come until much later, namely, in March of 1938. That announcement was sent to Warfield Company apparently by mistake. At any rate, we wrote the Lecithin Company on April 6, 1938, and inquired as to the terms of the offer. To this, reply was made that nothing would be done with Warfield unless Warfield admitted validity of the patent and freed the American Lecithin Company from the adverse decree and paid past damages.

"So far as Warfield was concerned, this was the status of the case until August, 1938, at which time another notice was set out and Warfield Company received a copy. Again inquiry was made and again the American Lecithin Company refused to deal with Warfield except as an adversary and refused to discuss a license.

"In July of 1939, after the decision of the Court of Appeals, another notice was sent out and again the Warfield Company inquired as to its status. Again the American Lecithin Company pointed out that it would not deal with Warfield except on terms which could completely settle the old suit.

"In August of 1939, for a period of about sixteen days, American Lecithin Company

did offer to grant Warfield a license. On August 14 this offer was extended to September 11, but on August 18 the extension was withdrawn. Nothing further was done with respect to Warfield Company until December 9, 1939, at which time an offer of license again was made. This offer did not state whether past damages would be waived or not and therefore Mr. William Warfield wrote on December 13, 1939 to ask what the action would be on that point.

"On January 29, 1940, the American Lecithin Company wrote that damages for prior use would be insisted upon. When a license was not signed on this basis, it promptly brought suit."

On December 9, 1939, The Warfield Company had on hand some lecithin which it had purchased from one Ferguson on October 31, 1939, and it continued to use this lecithin which it purchased from Ferguson until it began the use of lecithin which it purchased from the plaintiff under a contract made December 23, 1939, for a year's supply. The plaintiff concedes that the defendant had an implied license to use the Working patent in connection with the lecithin purchased from it under said contract of December 23, 1939, and it was this lecithin, purchased under this contract, that was continued to be used by the defendant until sometime after the date of the filing of the suit at bar.

There have been some different views expressed in respect of the effect of the principle that the owner of a patent shall not be permitted to so use his patent as to create a monopoly in an unpatented commodity. The view of the plaintiff seems to be that the owner of a patent may, for a period of six years less two days, use the patent for the purpose of creating a monopoly in an unpatented commodity and may, on the second day prior to the expiration of the six years, cease to so use it, and may, on the first day prior to the expiration of the six years, file a suit for the infringement of the patent and recover for the infringement during the entire period. This in spite of the fact that for the full period of six years less two days the owner of the patent was by his monopolistic conduct causing the infringer to pay more for the unpatented commodity than he would have had to pay but for said monopolistic conduct.

■ When one bears in mind that the misconduct which falls within the maxim "he who comes into equity must come with clean hands" must have infected the cause of action so that to entertain it would be violative of conscience and that it must relate directly to the very transaction of which complaint is made and not merely to the general morals or conduct of the person seeking relief, it seems to be clear that the foregoing contention of the plaintiff cannot be correct. Plaintiff's cause of action for infringement of its patent during the period that it used the patent to create a monopoly in an unpatented commodity was "infected," and merely to cease to so use the patent would not destroy the infection in the cause of action.

■ It is unquestionably true that the plaintiff's patent is not destroyed and that it may recover for infringements occurring after it has washed its hands of the conduct which rendered them unclean. In the case at bar, if plaintiff's patent is valid and infringed, then, as to that period of time after it has ceased to use the patent to create a monopoly in an unpatented commodity, it may recover for the infringement. The cause of action for infringement during that period of time is not "infected" by monopolistic conduct.

■ So far as the defendant, The Warfield Company, was concerned, the plaintiff was at all times up to and including December 9, 1939, insisting upon its supposed right to use the patent in suit to create a monopoly in the unpatented commodity, lecithin. Assuming, but not deciding, that on December 9, 1939, it ceased to so act in respect of The Warfield Company, the question arises as to whether or not The Warfield Company may be mulcted for using, in accordance with the teachings of the patent, the lecithin which it had purchased on October 31, 1939, from one Ferguson. On October 31, 1939, when the lecithin was purchased from Ferguson, the plaintiff was insisting in the Supreme Court of the United States and by letters that it had a right, at least as to The Warfield Company, to use the patent to create a monopoly in the unpatented commodity. The defendant was not required to acquiesce in that contention. Neither should the defendant be held to be required to purchase its requirements of lecithin from day to day in anticipation of the plaintiff's ceasing its unlawful conduct. The court does not believe that, under all the circumstances of the case, a two months' supply of lecithin was an unreasonable amount for the defendant to lay into its warehouse. Accordingly, the court

does not believe that the plaintiff should be permitted to mulct the defendant for infringement of the patent by the use, after December 9, 1939, and before December 23, 1939, in accordance with the directions of the patent, of lecithin purchased from a third person on October 31, 1939, even if the plaintiff ceased its unlawful conduct in respect of The Warfield Company on December 9, 1939. It may be that the maxim "De minimis non curat lex" sufficiently cares for the period from December 9 to December 23, 1939.

■ The offer of a license on December 9, 1939, was not an unconditional offer, because, when inquiry was made of it, the American Lecithin Company wrote, on January 29, 1940, that damages for prior use would be insisted upon. Accordingly, the court is of the opinion that, so far as the defendant is concerned, the plaintiff at no time prior to the institution of the suit at bar changed its conduct which was condemned in the earlier case to which reference has been made and that, accordingly, it is not now in court with clean hands.

■ As was indicated above, the second answer which the defendant makes to the claim of the plaintiff that it has ceased the conduct which resulted in the holding of "unclean hands" is that the conduct of the plaintiff generally in respect of licensing or refusing licenses under its patent has continued to create a monopoly in an unpatented commodity.

The American Lecithin Company offered to the trade, other than the defendant The Warfield Company, a written license to use the Working patent at a fixed price per pound of lecithin used or they granted an implied license to use the Working patent in respect of lecithin purchased from the plaintiff, American Lecithin Company.

The defendant makes a number of arguments supporting its contention, some of which seem to be rather frivolous and others of which appear to the court as having some force. The defendant first says that the licenses which were offered by the American Lecithin Company to the trade required those who purchased lecithin elsewhere to recognize the validity of the patent for the term of one year, while no such requirement was ever made of customers of the American Lecithin Company, they simply buy lecithin without any required form of contract and if they wish to turn around and buy lecithin elsewhere without paying a license fee they may do so the next week or the very same day. There is some force in this argument. Second, those who purchase lecithin elsewhere than from the American Lecithin Company are required to sign a written license, while those who purchase from the American Lecithin Company do not have to do so. There is some force in this argument. Third, the written licenses required reports to be made of lecithin purchased elsewhere. The court cannot see force in this argument. Fourth, no license was offered to a seller of lecithin. The court cannot see force in this argument. Fifth, the American Lecithin Company, during the period in question, did not really charge a royalty of twenty cents per pound which it purported to charge; the American Lecithin Company purported to sell at the same price no matter for what purpose the product was sold; no one was ever repaid the royalty when he used the product for an unpatented use. To the court, there seems to be considerable force in this argument. If the American Lecithin Company sold the same lecithin at the same price for an unpatented use and for a patented use it was not charging a twenty cent royalty for the use of the patent. This seems to be obvious. That is to say, it is not charging a twenty cent royalty from those who purchase lecithin from it and it is charging a twenty cent royalty under the written license from those who purchase from others.

On the whole, the court is of the opinion that the conduct of the plaintiff generally has been such that it cannot be said that it has ceased its monopolistic conduct.

■ In determining what issues, made on the defendant's counter-claim, which, as has been indicated, seeks an adjudication that the patent in suit is not infringed and that it is invalid, are open to decision in this case, can only be determined after an examination of the proceedings in the earlier case. Plaintiff says that, because of the adjudication in the former suit between the parties, the questions raised by the counter-claim are res adjudicata and cannot be examined by this court in this case. On June 9, 1938, the District Court in the earlier case filed a memorandum wherein it said: "Defendant interposed a defense based upon plaintiff's business methods. The Court decided that this defense is good, and that it was unnecessary to determine questions of validity and infringement. The Court cannot undertake

now to adjudicate rights under conditions which may never exist. The defendant has not made a showing which entitled it to an injunction against all suits based on the patent. The defendant does not claim that plaintiff threatens to bring suits similar to the one in which this decree is entered. The counterclaim, therefore, should be dismissed."

On the same date, the District Court made formal findings of fact and conclusions of law, wherein the court concluded as a matter of law:

"4. The defendant is not entitled to an injunction against the plaintiff.

"5. The defendant's counterclaim should be dismissed."

These two conclusions of law are not supported by any formal findings of fact, unless it be that conclusions that an injunction should be denied and a counter-claim should be dismissed are supported by no finding of any kind. On the same date, the District Court made a decree wherein it dismissed the complaint and the counter-claim and wherein it said: "The Court is filing separate findings of fact and conclusions of law. However, the Court's memorandum and supplemental memorandum, in so far as they contain findings of fact and conclusions of law, are to be considered as supplemental to the separate findings."

Whether the counter-claim in the former suit was viewed only as an attempt by the defendant to broaden the unclean hands defense, so as to project the effect of the monopolistic conduct of the plaintiff into the future and establish it as a bar to any suit by the plaintiff at any time against the defendant on the patent, or whether the counter-claim was viewed as a mere suit for a declaratory judgment that the patent was either not infringed or invalid or both, is not entirely clear. It does seem reasonably clear, however, that in whatsoever light the District Court regarded the counter-claim in the former suit it did not intend to pass either on the question of infringement or validity, in spite of the fact that it dismissed the counter-claim.

It is clear that the Circuit Court of Appeals did not pass on the validity of the patent. In its opinion (105 F.2d 207, 209) it says: "The district court did not deem it necessary to pass on the validity of the patent. With the view that we take of the instant situation, believing as did the district court that the monopoly defense

is impregnable, it is thought best not to dispose of the matter. Were we inclined to reverse on the monopoly ground, it is probable that under the circumstances we would consider it proper to remand the case for the trial court's consideration, rather than pass on the validity of the patent in the first instance." Whether the Circuit Court of Appeals passed upon the question of infringement is not so clear. Concerning that general subject, it said (105 F.2d 207, 209):

"The defendant argues that the 'infringement of the claims relating to the retardation of graying has not been proved' and suggests that it is possible that the use of the lecithin purchased from the plaintiff's competitors does not retard graying as the use of the plaintiff's lecithin does. *Even if it was essential to discuss this argument on this appeal,* we would not be convinced by the logic urged upon the court. The district court found, and the defendant's special answer to one of the plaintiff's interrogatories clearly shows, that the defendant made and sold chocolate having lecithin added thereto in the amounts within the range as claimed in the patent. Nowhere in the record is there even an intimation that lecithin, as sold in the trade for its use as a component of chocolate, possessed different qualities as far as its effect on graying was concerned.

"It is interesting to note, at this time, that the defendant concedes that the use of lecithin purchased from the plaintiff's competitors results in cocoa butter reduction and that in this regard it infringes the patent. We can not appreciate the cocoa butter concession and the graying retardation denial. The inconsistency which we perceive here might well be expressed in the words of defendant's witness Warfield, who stated that 'the more cocoa butter you have in chocolate, the more graying you get. * * * We use the lecithin to reduce the cocoa butter,' or in the words of plaintiff's witness Harris, who stated that 'the graying is due to the amount of cocoa butter present' and 'the lecithin permits the use of a lower percentage of cocoa butter in the chocolate.'

"Considering further the basis of defendant's contention, we find that the defendant in its amended answer, in pleading the defense of monopoly, admitted in effect that the lecithin bought from others was used in precisely the same way as plaintiff's lecithin was. Going directly to

the evidence adduced, we find no conflict as to the effect on graying of chocolate with or without lecithin. Edwards, general consultant to manufacturers of chocolate and users of chocolate coating, testified that the use of lecithin retarded graying in chocolate. Harris, consulting chemist for chocolate manufacturers, corroborated this testimony. Sobol, buyer of chocolate coating from the defendant, stated that the defendant's chocolate coating, admittedly treated by an addition of lecithin in amounts within the claims of the patent, resisted graying better than chocolate without lecithin."

A decision on the question of infringement, in the absence of a decision on validity, would hardly seem to be necessary to the decision which the Court of Appeals made, but if that court had even by way of obiter expressed an opinion on the question of infringement this court would be inclined to follow the obiter on the theory that it is what the court would have decided had the question been before it, but the words which are italicized in the language of the Court of Appeals, lastly above quoted, seem to indicate that it was not the intention of that court to decide the question of infringement, or even to make a definite expression thereon by way of obiter.

The result of the foregoing is that this court feels that it is compelled, because of the counter-claim in this case and because of the state of the record, to pass both on the question of infringement and on that of validity. If this court is mistaken and either of these subjects is foreclosed to it, then, of course, what this court may say on the foreclosed subject will be of no effect.

The claims of the patent which are in suit and in respect whereof the defendant insists upon an adjudication as to infringement and validity are Claims 4, 6, 9, 10, 11, 12 and 13. They are as follows:

"4. A new material in the confection industry, comprising a chocolate composition suitable for coating candy cores, and containing about 0.1 to 0.5% of lecithin, cores coated with such product being less subject to 'graying', at high atmospheric temperature than is ordinary chocolate coating."

"6. A chocolate mass having a consistency and melting point suitable for coating candy cores, cakes and the like, containing not substantially over 1% of lecithin, such product having a substantially greater tolerance towards water than has ordinary chocolate coating mass."

"9. In making chocolate confections, the herein described step of adding a small amount, not substantially over 1%, of lecithin, to a chocolate mass, the amount of lecithin so added being sufficient to reduce the 'graying' tendency.

"10. A chocolate confection comprising chocolate containing a small amount, not substantially over 1%, of lecithin, such product having substantially less tendency to 'graying' than do similar products containing ordinary chocolate without the lecithin.

"11. As a new material in the chocolate confectionery industry, a chocolate mass containing about 0.2% to 0.3% of added lecithin, such lecithin being sufficient to retard 'graying' to a substantial extent.

"12. In the manufacture of chocolate mass, the steps of reducing the content of cocoa butter and similar fatty material substantially below normal, and adding about 0.2% to 0.3% of lecithin, sufficient to impart to the mixture the necessary workability of the chocolate mass for coating by dipping, whereby the tolerance of the mass to water is substantially improved, and its sensitivity to variation in running temperatures is decreased.

"13. In the preparation of chocolate mass, the step of adding, at any stage of the manufacture, about 0.2% to 0.3% of lecithin whereby 'graying' of the finished chocolate product is at least retarded."

An examination of the specifications of the patent discloses that the prevention of "graying" is to be brought about "by adding a material, lecithin, which binds or blends the fats together, preventing separation of the same from the chocolate mass." The specifications do not indicate that the patentee contemplated that "graying" was to be prevented by the reduction of the cocoa butter content of the chocolate mass containing added lecithin.

On the record, made in this case, the court is satisfied: (1) That the defendant did not and does not use lecithin in its chocolate for the purpose of lessening or preventing "graying"; (2) that the defendant does add lecithin to its chocolate for the purpose of reducing the viscosity thereof and, consequently, of reducing the amount of cocoa butter required to be added thereto to make the chocolate work-

able; (3) that lecithin does not lessen or prevent "graying" of chocolate to which it is added; (4) that lecithin does reduce the viscosity of chocolate to which it is added; and (5) that because lecithin reduces the viscosity of chocolate to which it is added, the addition of lecithin to chocolate reduces the amount of cocoa butter required to be added to chocolate to make it workable.

Accordingly, the defendant infringes Claims 6 and 12, if they are valid. It does not infringe Claims 4, 9, 10, 11 or 13.

■ In 1937, the District Court for the District of Rhode Island held the patent in suit valid and infringed. American Lecithin Co. v. J. C. Ferguson Mfg. Works, Inc., 19 F.Supp. 294. On appeal, the Circuit Court of Appeals for the First Circuit held that American Lecithin Company was using its patent to create a monopoly in an unpatented commodity, lecithin, vacated the decree of the District Court, and remanded the case to the District Court with instructions to dismiss the bill. Included in the Court's opinion (J. C. Ferguson Mfg. Works, Inc., v. American Lecithin Co., 94 F.2d 729, on page 730) are the following observations:

"The use of chocolate in food and confectionery has long been well known. Lecithin is a natural organic substance which occurs as a component of many animal and vegetable substances, e. g., in yolks of eggs and in soy beans. In the great chemical advance at the beginning of the twentieth century it was isolated and became well known in the chemical field. As early as 1905 lecithin was found and reported in a sample of commercial chocolate examined in the analytical laboratory in the city of Leipzig, Germany; and this analysis was published in the 'Journal of Research for Food Materials' in 1907 (vol. 13, p. 52). The same facts were republished in 1907 and, in book form, in 1923, in which 'lecithin chocolate' is mentioned and the analysis shows it to be within the Working claims. The content of lecithin in the sample of chocolate analyzed at Leipzig in 1905 is also within that specified in the Working patent. In the United States patent to Martin dated 1915 each of the four claims refers expressly to lecithin as a component of foodstuffs; and in the United States patent to Moskovitz and Jacobson dated 1918 relating to foodstuffs, chocolate among others, it is said, 'There can also be added to the emulsion some lecithin.' The Bollman British patent of 1926 relates to the use of phosphatides—of which lecithin is one as the above quotation from the patent shows—in cocoa powders and refers particularly to the use of lecithin. In the letter from Conway on behalf of the plaintiff's predecessor to Working dated July 12, 1928, which first called Working's attention to the matter, it was said, 'Also, we are developing the use of Vegetable Lecithin as a component of Chocolate, Cocoa, and other food products, not only as a carrier of very high food value, especially for the nerves, not increasing the cost, but increasing the solubility of the Cocoa, which, of course, means that the sediment in the prepared Cocoa will be reduced, and the formation of any sediment at all greatly retarded.'

"It cannot be doubted that, when the Working patent was applied for, the use of lecithin in chocolate was well known. The effect of it in increasing fluidity is strongly suggested in the Bollman patent, but there appears to have been no previous recognition of its effect in preventing graying.

"Until the development of a process of obtaining lecithin from soy beans, it cost about $2 per ounce, and was too expensive for commercial use in foodstuffs. The discovery of that process reduced the price to $1 or less per pound, made it commercially available, and stimulated investigation into what it could be used for. It is a situation in which care should be exercised that the results of mere routine investigation be not accepted as patentable invention. Working's investigations disclosed that the presence of lecithin in chocolate mixtures used for candy delayed or prevented 'graying' and advantageously affected fluidity. To summarize, at the time when Working began his investigations which led to the patent in suit, the situation was this: Lecithin was well known and was a staple article of commerce; it had a recognized use and value in medicine and in various kinds of food including cocoa and chocolate; its effect on chocolate in preventing graying and perhaps its effect in increasing fluidity had not been noticed and attributed to it. Working observed these effects, and his discovery of them was the basis of his patent.

"As has been said, the claims of the patent are very broad. The Richet chocolate of 1905 is clearly within them; if offered for sale it would infringe the pat-

ent, a clear indication that as to some of its claims the patent is invalid for anticipation. The Richet chocolate appears to have been an article of commerce and may have been tested at the time in question to see whether it conformed to pure-food regulations. A chance composition or process which accidentally and ignorantly happened to involve the same element or step which was later discovered and recognized as important has been held not to anticipate a later patent. Pittsburgh Iron & Steel Foundries [Co.] v. Seaman-Sleeth Co., 3 Cir., 248 F. 705; McKee v. Graton & Knight Co., 4 Cir., 87 F.2d 262. But that is obviously not this case. The Richet use does not stand alone. Merck, a chemical and drug manufacturer, was making and listing a 'lecithin chocolate' in 1927. Whether all the claims of the Working patent are invalid, we need not decide, nor is it necessary to discriminate between claims, because on another ground we think the suit clearly cannot be maintained."

The Conway letter to Working dated July 12, 1928, referred to above, was introduced in evidence in this case. Portions of it are as follows:

"The principal field at present is the addition of a very small percentage of Lecithin to Nut Margarine which conveys to the latter all the foaming and browning effects of dairy butter. Also, we are developing the use of Vegetable Lecithin as a component of Chocolate, Cocoa, and other food products, not only as a carrier of very high food value, especially for the nerves, not increasing the cost, but increasing the solubility of the Cocoa, which, of course, means that the sediment in the prepared Cocoa will be reduced, and the formation of any sediment at all greatly retarded.

* * *

" * * * Vegetable Lecithin will melt at 50-60 degrees C, and will not suffer in any way from such heating. This plan is followed in incorporating the Lecithin into Chocolate."

Here were suggestions to Working before he began his work on lecithin and chocolate that: (a) Lecithin could be used as a component of chocolate; (b) not only as a carrier of very high food value, not (c) increasing the cost, but (d) increasing the solubility of the cocoa, and (e) that vegetable lecithin will melt at 50-60

degrees centigrade, (f) will not suffer in any way from such heating, and (g) that lecithin is heated to 50-60 degrees centigrade in order to incorporate it into chocolate. It seems to the court that this letter might properly suggest to one experienced in the manufacture of chocolate that if lecithin increased the solubility of cocoa and reduced the sediment in prepared cocoa and prevented the formation of sediment that it might reasonably be inferred that the addition of lecithin to chocolate would decrease the viscosity thereof and prevent the separation thereof into its component parts and thereby prevent graying. And since one experienced in chocolate manufacture knows that viscosity is reduced by the addition of cocoa butter, such a person might reasonably infer that if lecithin lessens viscosity it would be unnecessary to add cocoa butter to chocolate for that purpose.

Amongst the prior art patents introduced in the case at bar is the Bollmann Patent No. 1,660,541, issued February 28, 1928, on an application filed in the United States on December 15, 1925, and in Germany on October 30, 1925, for an "Easily-soluble cocoa powder and process of making same." In this patent, it is said (italics the court's):

"For the purpose of increasing the solubility of cocoa-powder it has been the practice to effect the roasting of the cocoa-beans at a moderate temperature and to decrease as far as possible the fat-content of the powder. Nevertheless the solubility has heretofore always been imperfect. If cocoa, prepared with milk or water, is allowed to stand for a while, a portion of the particles suspended in the liquid are deposited in the form of sediment.

"*The object of the present invention is to provide a method whereby it becomes possible to improve the solubility of the cocoa-powder* and at the same time to increase the nourishing value thereof.

"To this end after the cocoa-powder has been prepared, an addition is made thereto of phosphatides derived from vegetable materials, in particular from soy-beans. These phosphatides possess an intense emulsifying effect, and are thereby enabled to maintain in suspension the particles of cocoa floating in the liquid and to prevent the said particles from separating out to form a sediment. A further advantage of the addition consists in the fact that the

cocoa-butter does not separate out from the liquid and float thereon in the form of fine drops of oil.

"Experiments have shown that it is sufficient to add 2% of phosphatides to the cocoa-powder to achieve the desired effect.
\* \* \*

"On account of the presence of the phosphatides and in particular of lecithin as also of phytosterol, a most advantageous vitamine effect is obtained for the so-treated cocoa-powder in addition to its increased solubility."

The court understands that phosphatides include lecithin. By this patent, one skilled in the art of chocolate manufacture is told: (a) That the addition of lecithin thereto improves the solubility of cocoa butter; (b) that lecithin possesses an intense emulsifying effect; (c) that it thereby maintains in suspension the particles of cocoa floating in the liquid; (d) that it also prevents said particles from separating out to form a sediment; (e) that, as a result of adding lecithin, the cocoa butter does not separate out of the liquid and float thereon in fine drops of oil; and (f) that it is sufficient to add 2% lecithin to the cocoa powder to achieve the desired effect. Accordingly, this Bollmann patent, issued in Germany in 1925, and in the United States in February, 1928, told the chocolate manufacturer every thing, with one or two minor exceptions, that the Working patent told him. One skilled in the art of working chocolate certainly ought to know that if lecithin prevents cocoa butter from separating out of the liquid cocoa and from floating thereon in fine drops of oil it ought to prevent cocoa butter from separating out of chocolate coatings.

There was also introduced in evidence in the case at bar Rewald Patent No. 1,762,077, issued June 3, 1930, on an application filed in the United States on March 12, 1929, and in Germany on September 7, 1927.

From this patent it appears:

"For the production of many foodstuffs, particularly bakery and confectionery goods, pasteries and the like, fat and egg yolk are both used.
\* \* \*

"The addition of egg yolk is effective mainly because of its lecithin content and because of the yellow colouring substance, i. e., the lutein, which it contains. Therefore it is possible to replace egg yolk by lecithin in the form in which it can be ob-

tained in large quantities and at moderate prices from many animal and particularly vegetable substances, such as, for example, from soybeans. This has heretofore not been successfully accomplished, however, due to the fact that these phosphatides can be brought into aqueous emulsion only with difficulty and are then apt to soon decompose, for which reason they are quickly destroyed and must be treated with caution. \* \* \*

"I have not found that an emulsion of lecithin which is of a very durable character and may be employed as a substitute for egg yolk and fat can be produced by emulsifying lecithin with suitable food fats, for example butter, margarine, lard or the like, in such quantities containing at least 5% of the food fat that the emulsion contains at the same time the quantities of fat and egg yolk substances in the correct proportion requisite for the production of the food substance so that both constituents need no longer be added separately as hitherto."

"The addition of lecithin to margarine for the purpose of increasing its similarity to butter is, it is true, well known. \* \* It could not under any circumstances have been foreseen, however, that a mixture of fat containing lecithin to so high a degree as is employed in the present case would be durable in spite of the relatively large quantities of water present therein.
\* \* \*

"I claim:—

"Egg yolk substitute from fat and phosphatides consisting of a stable emulsion of food fats with about 5-20% of lecithin."

In this patent is found evidence of the knowledge of the emulsifying effect of lecithin, but, in addition thereto, there is pointed out the "tolerance of the mass to water," which is specifically claimed in Claims 6 and 12 of the patent in suit. The only thing claimed in the patent in suit which is not to be found specifically in the Bollmann and Rewald patents is the decrease in "sensitivity to variation in running temperatures," referred to in Claim 12. It seems to the court, however, that one experienced in the art of manufacturing chocolate ought to expect that if one added something to chocolate which had an emulsifying effect and which had the effect of reducing the viscosity thereof and of preventing the separation of the constituents thereof, it might reasonably be expected to have the additional effect of

decreasing the sensitivity of the chocolate and lecithin mass to variation in running temperatures.

Everything that Working told the world in the patent in suit was implicit in the patents to Bollmann and Rewald, above referred to, and in the suggestions which Conway made to Working before he began his work with lecithin and chocolate. The evidence referred to by the Circuit Court of Appeals for the First Circuit, relating to analysis of lecithin in 1905 at Leipzig, was introduced in the case at bar. That lecithin chocolate would have infringed the patent in suit.

There are some other interesting facts which should be considered in connection with the validity of this patent. The original Working application, which was filed on May 13, 1929, related only to the use of lecithin with chocolate or cocoa to prevent graying. There is no mention of reduction of viscosity or of the addition of less cocoa butter than normal to make a chocolate coating. In November, 1929, an article was published in the "Manufacturing Confectioner." That article stated that the addition of lecithin to chocolate lessens its viscosity. In February, 1930, another article in the same magazine told of the savings in cocoa butter and the reduction of viscosity. These articles were called to the attention of Mr. Eichberg, an officer of plaintiff. He called on the patent solicitor who was handling the Working application and on that same day the solicitor wrote to Working. In this letter he pointed out that the reduction in cocoa butter content was not shown in the old application and could not be added without introducing new matter. The letter also referred to the tendency of lecithin to increase the resistance of the chocolate mass to water. None of these ideas was in the original application. The plaintiff has not offered evidence which in the opinion of the court carries Working's date back of these articles.

The court is of the opinion that the disclosures of the patent in suit are the result of mere routine investigation and that they do not represent invention.

Counsel for the defendant may prepare and, within 7 days, present drafts of findings of fact, conclusions of law and a decree consistent with the views herein expressed. Counsel for the plaintiff, within 14 days, may present his objections to or his suggestions in respect of the drafts so tendered by counsel for the defendant, and counsel for the defendant may, within 18 days, file such reply, if any, as he may deem necessary. This having been done, the making of findings of fact, conclusions of law, and a decree will be taken by the court without further oral argument.

Counsel for the respective parties may take and keep, subject to the order of court, the exhibits of their respective clients.