## SYLVANIA INDUSTRIAL CORPORATION v. VISKING CORPORATION.

### No. 4966.

Circuit Court of Appeals, Fourth Circuit.

Jan. 6, 1943.

948

Lawrence Bristol, of New York City (Elmer R. Helferich and Leonard A. Watson, both of New York City, and C. O'Conor Goolrick, of Fredericksburg, Va., on the brief), for appellant and cross-appellee.

William S. Pritchard, of New York City (Harry H. Levin, of New York City, and Lewis C. Williams and Williams, Mullen & Hazelgrove, all of Richmond, Va., on the brief), for appellee and cross-appellant.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

Four United States patents which belong to The Visking Corporation and relate to artificial sausage casings are in controversy in this suit, which was instituted April 6, 1939. They are the Freund patent No. 1,959,978, issued May 22, 1934 on an application filed January 12, 1931, which relates to the preprinting of a name or mark on the casings before they undergo the packing process; the DeCressey patent No. 1,890,215, issued December 6, 1932, on an application filed November 17, 1930, which relates to sausage casings with a plurality of apertures for the escape of water and fat during the cooking operation; the Henderson and Dietrich patent No. 1,612,508, issued December 28, 1926, on an application filed April 14, 1926, which relates to an apparatus and a method for drying the casings in the course of manufacture; and the Hewitt patent No. 1,967,773, issued July 24, 1934, on an application filed November 26, 1930, which also relates to an apparatus and a method for drying the casings in the course of manufacture.

Validity and infringement of the patents were in issue in the District Court, and also the defense that improper use of the patents by the plaintiff disentitled it to relief. On April 3, 1941, the judge found that all the patents were valid and infringed, but denied relief on the ground that the plaintiff had attempted by its method of doing business and by improper use of the patents to secure a limited monopoly on unprinted regenerated cellulose sausage casing which is an unpatented material. In subsequent supplemental proceedings the plaintiff offered evidence that satisfied the judge that it had purged itself of its illegal conduct; and on March 13, 1942, the judge filed an interlocutory decree holding that the plaintiff had so purged itself by May 12, 1941, and was entitled to an injunction against future infringement and an accounting from that date for past infringement. Each party was to pay its own costs. This relief was granted upon the condition that the plaintiff conduct its business and use its patents without attempting to create a monopoly in unpatented material; and leave was granted to the defendant to appeal to the court for a vacation of the decree upon showing that the plaintiff or any of its representatives were violating this condition.

In the supplemental proceedings the defendant filed an answer setting up that it had discontinued the use of the apparatus charged to infringe the Henderson and Dietrich patent, and since the decision of the court of April 3, 1941, had not used

this patent and had had no intention of again using it or the method which the patent disclosed. The answer prayed that the complaint be dismissed as to this patent. In support of the answer defendant offered proof, not controverted by the plaintiff, that the use of the apparatus in question had been discontinued by the defendant about January 5, 1938, more than a year prior to the institution of the suit. By the decree of March 13, 1942, this supplemental answer, on motion of the plaintiff, was stricken from the record.

The defendant appealed from the whole decree; and the plaintiff filed a cross appeal from the action of the court in denying an accounting for the period prior to May 12, 1941, and in making the relief given the plaintiff conditional on its subsequent behavior, and in requiring each party to pay its own costs.

We shall consider first the question of validity and infringement of the patents in suit. The type of artificial sausage casing now in commercial use by the parties to this cause comprises a plain thin walled tube of regenerated cellulose or cellophane. It was devised as an improved substitute for the more or less objectionable ordinary animal casing by Cohoe and Fox to whom patent No. 1,070,776 was issued in 1913. The article proved to be thin, flexible, sufficiently strong and edible. In the same year Cohoe applied for patent No. 1,163,740 issued in 1915 which disclosed a press for extruding the raw material, and the steps from the extrusion to the drying of the material in the process of manufacture, which in general are followed by commercial manufacturers today. Commercial operations took place in Canada in 1914 and shipments were made to Europe and the United States until interrupted by the first World War. The DuPont Cellophane Company acquired ownership of the Cohoe patents in 1923 and in 1925 the plaintiff secured a license thereunder. Patent No. 1,070,776 expired on August 19, 1930, and since that date regenerated cellulose sausage casings have been unpatented articles of commerce.

*Freund Patent:*

The specification of this patent gives the following description of the invention. It relates to means whereby a cellulose sausage casing, which is neither porous nor absorbent to any great extent, may be so printed that the printed characters will stand the severe treatment which the cas-ing necessarily undergoes in the packing house process. Previous unsatisfactory means used by manufacturers to identify their goods included a tag tied to the casing, a printed band enclosing the casing, decalcomania transfer applied after manufacture, and branding by a heated die. It had not been practical to apply printed matter because the printing would not withstand the curing operation. To enable this to be done successfully, the ink employed must have great opacity. The composition of the ink that may be used is described in considerable detail.

Of the eleven claims of the patent, seven include a description of the ink to be used; but these claims are not in suit, doubtless because the defendant does not infringe them. The defendant uses seven different inks, and the plaintiff for a large part of its products uses inks that do not come within any of these claims. Claims 1, 2 and 3 in suit are as follows:

"1. A method of producing a marked stuffed sausage which comprises: imprinting a mark or character in waterproof, smoke-proof, opaque ink upon a substantially dry cellulose casing and hardening the ink; stuffing the casing; and subjecting the stuffed product to a curing operation.

"2. As an article of manufacture, a cured sausage comprising a filling of sausage meat and a pre-printed cellulose casing bearing on its surface exposed characters in ink which have withstood the curing operations (smoking, cooking, or both) to which the filled casing was subjected.

"3. As an article of manufacture, a regenerated cellulose sausage-casing bearing on its surface exposed printed hardened opaque ink characters, said characters being proof in exposed condition against hot water, and smoke fumes, whereby the printed casing may be stuffed with sausage meat and the stuffed product may be cured without substantial injury to said characters."

The examiner in the Patent Office rejected these claims as functional, pointing out that they covered the concept of producing a cellulose casing containing printed matter, resistant to water, acid and heat, in such terms as to include all possible ways of producing it; and hence the patentee merely stated a desirable result in these claims without specifying the means of attaining it. The Board of Appeals in the Patent Office reversed the ex-

aminer and reinstated the claims; and the main argument of the plaintiff in support of the validity of the claims seems to be that in view of the Board's decision nothing more need be said.

We agree with the examiner. Stuffing regenerated cellulose sausage casings and then cooking and marking them were standard practices long before Freund; and he contributed nothing in the claims in suit except the idea of pre-printing the casing with a desirable ink without showing how such an ink could be obtained. The idea of marking sausage casings with the owner's name in order to identify the product to the public was not new, as is shown by the specification of the patent. Moreover, it was common practice before Freund to stuff preprinted cotton cloth containers with sausage and then subject them to cooking and smoking operations. It was also prior practice to print the maker's name on cellophane wrappers for sausage, as well as for other products; and as cellophane is the material from which sausage casings are made the practicability of printing it had been established.

In view of these circumstances we are forced to reach the conclusion, notwithstanding the favorable action of the Patent Office, that the conception of a preprinted sausage casing was not an inventive thought, and that the product or end result did not itself involve invention. It may be that invention resides in some of the claims in the description of the ink required to bring about the result; but these claims are not before us. To uphold the claims in suit would extend the patent to cover all preprinted casings bearing characters capable of withstanding the curing operations, and this, we think, would violate the rule that a patentee may not broaden a product claim by describing the product in terms of its use or function so as to include methods not described in the patent. Holland Furnace Co. v. Perkins Glue Co., 277 U.S. 245, 247, 48 S.Ct. 474, 72 L.Ed. 868; General Electric Co. v. Wabash Co., 304 U.S. 364, 370, 58 S.Ct. 899, 82 L.Ed. 1402; Demco, Inc. v. Doughnut Mach. Corp., 4 Cir., 62 F.2d 23, 25.

It appears from the evidence that the great commercial success of the plaintiff was not due primarily to the preprinting of the sausage casing; but even if it contributed to the result, it could not save claims so clearly invalid as claims 1, 2 and 3 of the Freund patent. McClain v. Ortmayer, 141 U.S. 419, 427, 428, 12 S.Ct. 76, 35 L.Ed. 800.

*DeCressey Patent:*

The specification shows that the patent relates to a sausage casing with holes in it. During the process of manufacturing sausages in cellulose casings water or fat pockets may develop; and if an attempt is made to puncture the casings to permit the escape of these substances, the casings usually split. To meet this difficulty the patent proposes a sausage casing provided with a number of prepunctured holes at each end. Any suitable means may be used for making the holes, preferably a punch like that used in punching railroad tickets, so that the holes will be clean and not ragged.

Of the six claims in suit, the following are typical:

"1. The method of preparing a sausage casing for stuffing which comprises punching a plurality of apertures therein."

"3. A sausage casing having a plurality of apertures formed therein."

"5. A cellulose sausage casing having a plurality of apertures formed therein adjacent one of its ends.

"6. The method of producing sausage which comprises forming perforations in a sausage casing, stuffing said casing, and then smoking and cooking said sausage and permitting water and fat which are not absorbed by the sausage mixture to escape through said apertures."

The idea of perforating sausage casings was not new, for it was common practice in stuffing animal casings to prick them when they came from the stuffer, if bubbles of air or water appeared. Furthermore the Berg patent No. 1,508,155 suggested the idea of using sharp pointed brads to perforate a sausage container made of pig's hide, before filling, in order to permit the escape of air. So it appears that the desirability of providing holes in sausage casings as a means of escape for undesirable substances was common practice.

The defendant says that it is shown by the DeCressey patent and by the testimony that neither of these practices would be feasible, if applied to regenerated cellulose sausage casings, because in the first the holes would split and in the second the holes would be too small. If so, the

common expedients of making the holes smooth and round, as is commonly done in making holes in sheets of paper and of making the holes larger when desired, were so obvious and so commonplace as to deny even a suspicion of patentable invention. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58. We hold the DeCressey patent to be invalid.

### Henderson and Dietrich Patent:

This patent relates to a method and an apparatus for treating cellulose sausage casings. It describes casings and a method of manufacture of the casings in a wet state which resemble the disclosures of the Cohoe patents No. 1,070,776 and No. 1,163,740. The important feature of Henderson and Dietrich is a dryer for the casing after it has been subjected to a glycerine bath and the excess glycerine has been pressed out. A predetermined length of tubing is then drawn into and inflated within a limiting tube, preferably made of porous material to permit the escape of moisture. Heated air for the inflation of the casing is admitted at one end of the limiting tube and permitted to escape slowly at the other. The limiting tube is located within an outer drying chamber of large diameter through which dry warm air is blown in large quantities and brought in contact with the outer surface of the porous tube.

Typical claims of the patent are as follows:

"1. The method of treating casings for sausages, etc. which comprises: inflating the casing by pneumatic pressure within a limiting tube, and subjecting the casing to a drying operation while thus inflated."

"5. The method of finishing a cellulose casing, which comprises: passing a column of drying air under moderate pressure through the casing and thus maintaining the casing in inflated condition within a confining tube which is of a character to permit escape of moisture, and passing a drying current of air, or the like, in contact with said tube."

The defendant's drying operation, which is charged to infringe this patent, comprises a vertically mounted impervious metal tube surrounded by a hot water jacket. The casing is carried down through the middle tube by the weight of a metal nipple with a small central opening attached at one end. Air is then admitted to the casing at the top inflating it and escaping slowly at the bottom. The drying heat is applied externally to the impervious confining tube by the hot water jacket.

Discussion of the validity and infringement of this patent may be omitted at this point for reasons that will presently appear.

### Hewitt Patent:

The specification of this patent shows that it also relates to an apparatus and a method of drying cellulose sausage casings as they come in the course of manufacture from the extrusion machine. The primary object of the patent is to provide means of continuously drying the casing while it is being advanced and thereby obviating the necessity of cutting the casing into relatively short lengths as was done in the process of the Henderson and Dietrich patent, No. 1,612,508. In the preferred form of the Hewitt structure there is an outer drying chamber, through which heated air is circulated. Within the chamber the casing is continuously advanced horizontally in an inflated condition inside a porous tube of larger diameter to prevent the casing from dragging on the sides of the tube in its advance. Before entering the drying chamber the casing is caused to pass through a pair of squeeze rolls whereby it is flattened and sealed. At the opposite outlet of the drying chamber is disposed a second pair of rolls whereby the issuing casing is collapsed. The portion of the casing inside the dryer is inflated with air introduced at the exit end and the quantity of air within the casing remains constant and thereby determines the size of the casing. This bubble of air remains inside the casing between the rolls as the casing is continuously advanced and moves past it. When a sufficient quantity of air has been introduced, the exit is closed and the entrapped air remains stationary, inflating the casing to the proper diameter as successive portions thereof are passed through the dryer. After the casing has been dried and passes through the second pair of rolls in a flattened condition it is wound up upon a cylindrical tubular mandrel.

Typical of the claims are method claims 3 and 5, and apparatus claim 7, which are as follows:

"3. A method of drying tubing, which method comprises inflating a section of the tubing solely with a gaseous medium, entirely collapsing the tubing at both ends of the inflated section, advancing the tubing in such manner that the gaseous medium

advances bodily therethrough while remaining substantially constant in quantity, and subjecting the successively inflated portions of the tubing to a drying medium."

"5. A method of drying a continuous length of tubing which comprises: continuously advancing a length of tubing through heated air, sealing that portion of the tubing which is entering the heated air, inflating with entrapped gas that portion of the tubing which is within the heated air, and completely deflating the tubing as it is being withdrawn from said heated air."

"7. In apparatus of the character set forth, a housing through which an elongated tube is movable for treatment; tube collapsing means adjacent the inlet of the housing through which the tube moves and forwardly of which it is inflated; squeezer means adjacent the outlet of the housing through which said tube is threaded, said squeezer means collapsing the tube; said collapsing means and squeezer means maintaining the inflating medium entrapped in that portion of the advancing tube located between said collapsing means and squeezer means."

The validity of the Hewitt patent is attacked mainly on the ground that it was not the first patent in which cellulose sausage casing was dried in a continuous operation while inflated. The patent to Voss No. 1,759,495 issued May 20, 1930, about six months before Hewitt's application was filed, shows a somewhat similar structure. The casing in tubular form is conducted through a pair of pinch rolls placed at the entrance to a drying chamber; and the casing, after passing through this chamber, is attached to the nozzle of a winding drum placed adjacent ·to the exit of the chamber. Air is blown through the nozzle into the casing whereby it is inflated as far as the pinch rolls. Warm air is then blown into the drying chamber through which the casing is slowly drawn so that it leaves the chamber in a dry state. The casing is then wound in an inflated state spirally upon a winding drum, and when fully wound is cut off. Then the casing, emanating from the drying chamber, is fastened to the nozzle of a second drum nearby and the operation is repeated.

In the Henderson and Dietrich patent No. 1,612,509, a modification of the Henderson and Dietrich patent No. 1,612,508 in suit, the drying process is not continuous. The patent discloses, however, a drying chamber into which the casing is run between squeezer rolls and from which the casing is passed on to a tubular mandrel against which it is pressed by another set of rolls. During its passage through the dryer, the casing is inflated continuously by air delivered at one end and allowed to escape at the other.

Upon these two patents the examiner in the Patent Office rejected the claims of the Hewitt patent. He was of the opinion that no special result was obtained by the maintenance of a substantially constant volume of air in the Hewitt apparatus as compared with the Voss structure in which the air in that part of the casing in the drying chamber· was also constant, although unlike Hewitt, air was constantly added to that part of the casing which emerges from the drying chamber and is wound up on the drum in an inflated state. But the Board of Appeals in the Patent Office reversed this decision saying that Voss does not limit the expanding air to the portion of the casing within the drying chamber; and while Henderson does disclose this, his patent does not show the sealing of the expanding air, but provides for the constant withdrawal of the air and the addition of a new supply to the portion of the casing which is advancing through the drying chamber. The Board held that the change was not an obvious one over the art relied upon.

In our opinion this conclusion was sound. The Hewitt contribution was by no means revolutionary. Indeed its indebtedness to the prior disclosures already described is obvious; and there were other patents prior to Hewitt, such as Cohn patent No. 1,484,552, relating to open weave fabric tubing for gas mantles, and the Mayall patent of 1860, No. 28,389, relating to rubber tubing for hoses, in which the tubing passed between rollers at the entrance and at the exit of a chamber through which the tubing was continuously advanced in a distended condition for drying or other local treatment. Nevertheless, the Hewitt method was an improvement of such practical advantage that it superseded the earlier· practices and the defendant itself has acknowledged its superiority at the risk of infringement. These facts assume persuasive proportions when we consider the great volume of business carried on by the industry, the large part of·the commercial field occupied by the parties to this cause,

and their constant efforts to improve their processes of manufacture.

As it turned out in actual experience, there were great advantages in the Hewitt drying method, particularly in an increase in the speed of the operation and a substantial decrease in expense as compared with the abandoned process of the Henderson and Dietrich patent. Plaintiff's evidence showed that under Henderson and Dietrich eight minutes were allowed for drying small frankfurter casings and as long as forty-five minutes for the large casings. With the Hewitt process the large casings are run through at the rate of 8 feet a minute and the small casings at the rate of 80 feet a minute. Savings were secured in labor and maintenance in· the amount of steam used for heating in the reduction of air employed for inflation, and in the production of a dry casing in a form that made possible economies in subsequent operations. It was estimated that between 1933, when the Hewitt method was substituted for that of Henderson and Deitrich, and 1939, the Visking Company saved approximately two million dollars by use of Hewitt dryers. Additional advantages were that there was no scratching of the surface of the casing in the passage through the Hewitt dryers; that different sizes of casing could be dried in the same dryer and that lateral shrinkage of the casing was controlled. The District Judge made the finding of fact that the method and apparatus embodied in the Hewitt patent during the period mentioned had resulted in the saving described.

The defendant points out that in the commercial application of the Hewitt patent the plaintiff has introduced a number of improvements and additional devices, such as the use of driven instead of idler squeeze rolls at the entrance of the drying chamber, the use of very large rolls at the exit end of the driving chamber, the elimination of the porous tube, &c.; and the defendant argues therefore that these improvements rather than the patented appliance have brought about the advantages that have been described. Doubtless these improvements have contributed to the result, but after all they were improvements only of the Hewitt structure and the record as a whole demonstrates that it has been of substantial benefit to the industry. In our opinion the issuance of the patent was justified; the Hewitt process was something that would have been seen before, had it been within the ordinary skill of the art.

The Hewitt patent is also attacked on the basis of testimony given by Cohoe, the pioneer patentee, and by one Stevenson that the cellulose casings, made under their supervision and sold in Canada, were dried in pieces of considerable length in an inflated condition over a series of heated rolls, the inflating medium being entrapped in the region of the heated rolls by a pair of snubbing bars at the entrance of the dryer and a small roll at the exit. It is contended that this testimony invalidates the patent under the provisions of the patent statute, 35 U.S.C.A. § 31, which requires that a machine to be patentable must not be known or used by others in this country; and it is said that knowledge in this country occurred when Cohoe came to the United States. This testimony was contradicted in substantial respects by Gillies, the chief engineer of the company by which Cohoe was employed. Moreover, Cohoe made no mention of this drying method in his subsequent patent. The District Judge made the finding of fact that Cohoe's use and the commercial operation in Canada did not include the drying of a casing in an inflated condition. Since it is impossible to say that this finding was clearly wrong, this ground of opposition to the patent must be rejected.

Finally, the defendant attacks the Hewitt patent on the ground that Hewitt failed to comply with the provisions of the patent statute, 35 U.S.C.A. § 33, which provides in part that in the case of a machine, the patentee "shall explain the principle thereof, and the best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions". The point is that Hewitt, after constructing a drying apparatus such as described in the patent built a more substantial one in May, 1930, six months before his filing date, in which the rolls at the entrance to the dryer were positively driven and which worked a little better than the original structure. The patent application did not disclose this improvement and it is contended that this failure was fatal to the patent. Stelos Co. v. Hosiery Motor-Mend Corp., 295 U.S. 237, 241, 55 S.Ct. 746, 79 L.Ed. 1414; Id., D.C., 60 F.2d 1009, 1011. We think that the disclosure was a substantial compliance with the statute. The structure described was complete and was actually operated by the plaintiff satisfac-

torily. The principles of the machine were clearly explained and the mechanical change from idler to power driven squeeze rolls was one within the grasp of any person skilled in the art.

Infringement of the Hewitt patent by the drying process followed by the defendant since 1938 is not seriously disputed. At that time the defendant ceased to use a type of drying apparatus, said to infringe the Henderson and Dietrich patent No. 1,612,508, in which short lengths of sausage casing were dried, and began the use of a continuous operation in accordance with the Hewitt disclosures, including a pair of pinch rolls at the entrance and at the exit of the drying chamber, by which a constant quantity of air within the casing is entrapped.

We come next to consider the improper use of the patents in suit by the plaintiff, as found by the District Court and not disputed by the plaintiff, and the effect of this conduct upon the plaintiff's right to relief in this case. The District Court in its findings of April 3, 1941, stated that beginning in 1934 the plaintiff issued to the Budenz Company of Philadelphia each year a license for the nominal sum of $25 for preprinting sausage casings under the Freund patent with the restriction that the process be used only on casings manufactured by the plaintiff. Acting under this limitation the plaintiff on April 21, 1938, demanded that the Budenz Company cease printing casings manufactured by the Sylvania Industrial Corporation, the defendant in this case. Since 1935 the plaintiff has had a license agreement with the Acme Corporation of Chicago under the Freund patent similarly restricted, and since 1938 the plaintiff has had license agreements, similarly restricted, with Kenwood Press, Inc. and M. G. Boas & Company both of Chicago.

Since 1933 the plaintiff has printed on its shipping cartons and in its published price lists a notice that the purchaser of plaintiff's casings is licensed free of charge to practice the patented processes owned by the plaintiff in packaging food products therein, and plaintiff has granted no other licenses to meat packers to use its patented processes. The notices were sent out because the plaintiff desired without a separate license agreement in each case to give its customers a right to use these patented processes, if they made use of the plaintiff's casings.

In settlement of patent litigation between the plaintiff and the Transparent Package Company of Chicago, a competing manufacturer of sausage casings, a license agreement was made on December 27, 1937, whereby Transparent was given a license under fifty patents belonging to the plaintiff, including all of the patents in suit. This agreement restricted Transparent from manufacturing sausage casings in the frankfurter sizes until January 1, 1943, and required Transparent to maintain prices and terms of sale as fixed by the plaintiff on all articles made by use of the patents. By virtue of this license the plaintiff fixed prices below which Transparent could not sell plain unpatented and unprinted sausage casings.

The defendant has lost business and has been damaged by the plaintiff's method of doing business.

The court found from these facts that the plaintiff was making use of patents owned by it, including the patents in suit, for the purpose of securing a limited monopoly of an unpatented material, that is, plain, unprinted, regenerated cellulose sausage casings, and concluded, therefore, that the plaintiff was not entitled to relief in this suit even though, as the court held, the patents in suit were valid and infringed by the defendant. This legal conclusion is in accordance with the doctrine that the use of the patent monopoly to restrain competition in unpatented material is contrary to the public policy expressed in the constitution and laws of the United States to promote the progress of science and useful arts by securing to inventors the exclusive right to their inventions for limited times. In Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 491, 492, 62 S.Ct. 402, 404, 86 L.Ed. 363, the court said:

"A patent operates to create and grant to the patentee an exclusive right to make, use and vend the particular device described and claimed in the patent. But a patent affords no immunity for a monopoly not within the grant. Interstate Circuit v. United States, 306 U.S. 208, 228, 230, 59 S.Ct. 467, 475, 476, 83 L.Ed. 610; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 456, 60 S.Ct. 618, 625, 84 L.Ed. 852, and the use of it to suppress competition in the sale of an unpatented article may deprive the patentee of the aid of a court of equity to restrain an alleged infringement by one who is a competitor. It is the established rule that a patentee who has granted a license on condition that the

patented invention be used by the licensee only with unpatented materials furnished by the licensor, may not restrain as a contributory infringer one who sells to the licensee like materials for like use. Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann. Cas.1918A, 959; Carbice Corp. v. American Patents Corp., supra [283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819]; Leitch Manufacturing Co. v. Barber Co., supra [302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371]; cf. United Shoe Machinery Co. v. United States, 258 U.S. 451, 462, 42 S.Ct. 363, 367, 66 L. Ed. 708; International Business Machines Corp. v. United States, 298 U.S. 131, 140, 56 S.Ct. 701, 705, 80 L.Ed. 1085.

\* \* \* \* \* \*

"It is a principle of general application that courts, and especially courts of equity, may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest."

These conclusions were announced by the District Judge on April 3, 1941, and thereupon the plaintiff took certain steps to meet the criticisms of the court and to purge itself of its illegal conduct. On June 27, 1941, the plaintiff filed supplemental proceedings in which it showed to the satisfaction of the court that it had changed its method of doing business and was no longer attempting to monopolize the sale of unpatented material. Accordingly, on March 13, 1942, the court filed an interlocutory decree in which it held that all of the patents in suit were valid and infringed by the defendant; that until May 12, 1941, the plaintiff, by its method of doing business and its use of its patents including the patents in suit, had attempted to secure and had secured a limited monopoly of unpatented material; that the plaintiff's purge was complete on May 12, 1941; that the defendant be enjoined from further infringement and account to the plaintiff for profits received by it and damages suffered by the plaintiff since May 12, 1941; that the case be referred to a special master to take an accounting; and that each party pay its own costs. The relief granted was made dependent upon the plaintiff conducting its business and using its patents lawfully, and leave was reserved to the defendant to apply to the court to vacate the decree upon showing that the plaintiff or its representatives was conducting the business or using the patents in a way to create a limited monopoly of unpatented materials.

Both parties appealed from this decree. We consider first the appeal of the plaintiff which was taken on the grounds (1) that the plaintiff was entitled to an accounting from the date of the first infringement of the DeCressey patent, the Henderson and Dietrich patent and the Hewitt patent, respectively; (2) that the decree should not be made dependent on the plaintiff conducting its business and using its patents lawfully in the future; (3) that the decree should not be made conditional on the acts of the plaintiff's representatives; (4) that the plaintiff is entitled to its costs.

With respect to its first ground of appeal the plaintiff claims that its improper conduct was confined to its use of the Freund patent and that therefore recovery under the other patents should not be restricted to the period subsequent to May 12, 1941. It is said that there was no evidence that any of the patents except Freund had been used improperly and that the plaintiff was entitled to a separate ruling upon each of the other three patents and to unrestricted recovery thereon. But we think that it is impossible to separate the patents from one another in order to determine the extent of the plaintiff's recovery in this case. All of the patents were used by the plaintiff in the transaction of its business of manufacturing and selling cellulose sausage casing. Insofar as it was able to do so, the plaintiff used these patents and others which it owned, not only to prevent infringement but to extend its monopoly to unpatented material. This is shown not only by its restricted licenses to printers under the Freund patent, but also by its licenses to customers under patents not in suit, and by its agreement with the Transparent Package Company, a competitor, whereby a license under all the patents in suit, together with other patents, was granted in a price fixing agreement. We think the facts of the case justified the conclusion announced in the decree of the court that the plaintiff had been attempting to secure limited monopoly by the use of the patents owned by it, including the patents in suit. The case is within the ruling in Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293, where five patents relating to different parts of the same machine were in suit, as to one of which the patentee had corruptly suppressed evidence of an in-

validating prior use, and had secured a prior decree of infringement. It was held that the relation of the patents to one another and the use made of the prior decree brought the case within the doctrine that he who comes into equity must come with clean hands; and therefore the cases on all of the patents were dismissed. We are in accord with the conclusion of the District Judge on this point expressed as follows in its memorandum opinion in the pending case: "The plaintiff and defendant are competitors in the business of manufacturing and selling regenerated cellulose sausage casings. The suit involves four patents, two for the casings per se and two for a method of making the casings. The unlawful practices of the plaintiff with reference to the Freund patent have immediate and necessary relation to the equity which the plaintiff seeks in respect of the matter in litigation and such practices cannot be deemed unconnected with the causes of action based on the other three patents."

We are in accord also with the provisions of the decree whereby the relief granted to the plaintiff by way of injunction and accounting is made dependent upon the continuance of good conduct on its part and on the part of its representatives, whether they be executive officers or salesmen. The plaintiff has been making illegal use of a valuable privilege granted under the patent statute and should be grateful that the privilege has been continued on condition of good behavior, rather than forfeited altogether.

The defendant appeals on the grounds (1) that all the patents in suit were invalid and none of them was infringed; (2) that the complaint as to the Henderson and Dietrich patent should have been dismissed because, as alleged in the answer filed by the defendant in the supplemental proceedings and shown by the proof, the defendant abandoned the use of the apparatus alleged to infringe the Henderson and Dietrich patent in 1938, and has had no intention since that year of using the alleged infringing apparatus; (3) that the plaintiff's use of the patents in suit disentitled it to any relief and the suit should have been dismissed upon the decision of the court on April 3, 1941, and the reopening of the case in supplemental proceedings upon the petition of the plaintiff should not have been allowed; (4) that the plaintiff did not show in the supplemental proceedings that it had completely purged itself of its illegal conduct; (5) that defendant's counterclaim for an injunction against the continuance by the plaintiffs and its associates of practices in violation of the anti-trust laws should have been sustained.

We have already disposed of the first ground of defendant's appeal to the extent of holding that the Freund and De-Cressey patents are invalid and the Hewitt patent is valid and infringed. We do not find it necessary to pass on the validity of the Henderson and Dietrich patent, because in our opinion the second ground of the defendant's appeal is well taken and the bill of complaint as to this patent should have been dismissed, when it was ascertained that the defendant discontinued the use of this patent before the present suit was instituted and before the plaintiff ceased its improper use of the patents in suit. On this point the District Court took the position in reliance upon General Electric Co. v. New England Elec. Mfg. Co., 2 Cir., 128 F. 738, that the abandonment of infringement by a defendant does not deprive the court in a suit subsequently brought of the discretion to restrain future infringement and to direct an accounting. We are in accord with the principle of that decision but it differed materially in the facts. There was no improper conduct on the part of the patentee, the defendant continued to deliver infringing articles after the institution of the suit, and an accounting was required. In the pending case the questions of validity and infringement of the Henderson and Dietrich patent have become moot; no accounting is needed because recovery is barred by plaintiff's misconduct; there is no likelihood of future infringement, and the exercise of the injunctive power of the court in favor of the wrongdoer is not required or justified.

The defendant's third contention that the case should have been dismissed on April 3, 1941, when the improper conduct of the plaintiff was denounced in the decision and findings of the court, rests primarily on the fact that the plaintiff continued its improper practices at least as late as that date and after the issue had been raised in the defendant's answer. It is argued that proper practice required the dismissal of the case with costs on that date, leaving the plaintiff to a new suit after the ill effects of its illegal conduct had been fully dissipated. We think, however, that there was no abuse of discretion

on the part of the court in permitting the new facts to be shown in supplemental proceedings and pleadings under Rule 15 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c rather than requiring the institution of a new suit. Rule 1 expressly provides that the rules shall be construed to secure just, speedy and inexpensive determination of every action, and undoubtedly the course taken by the District Court led to an earlier determination of the issues in suit with justice to both parties. While equity should withhold its assistance from the owner of a patent, who uses it to restrain competition in the sale of unpatented articles, by declining to entertain a suit for infringement, relief may be afforded when it clearly appears that the improper practice has been fully abandoned and the consequences of the misuse of the patent have been dissipated. B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L.Ed. 367; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 493, 62 S. Ct. 402, 86 L.Ed. 363; see, also, American Lecithin Co. v. Warfield Co., D.C., 23 F. Supp. 326, 38 U.S.P.Q. 34; American Lecithin Co. v. Warfield Co., D.C., 42 F.Supp. 270; Barber Asphalt Corp. v. LaFera Grecco Contr. Co., D.C., 30 F.Supp. 497, reversed 3 Cir., 116 F.2d 211, modified 3 Cir., 122 F.2d 701; Dehydrators, Limited v. Petrolite Corp., Limited, 9 Cir., 117 F.2d 183; Universal Sewer Pipe Corp. v. General Const. Co., D.C., 42 F.Supp. 132; Novadel-Agene Corp. v. Penn, 48 U.S.P.Q. 698; reversed in part 5 Cir., 119 F.2d 764, certiorari denied 314 U.S. 645, 62 S.Ct. 85, 86 L.Ed. 517.

But the defendant further contends that the plaintiff's business methods have not so completely changed as to entitle it to relief even as to the period subsequent to May 12, 1941, when, according to the court's decree, the purge was complete. The complaint is that the plaintiff met the objection to the restrictive feature of its licenses by withdrawing the licenses altogether from printers and packers, with the result that a purchaser of the defendant's casings can make use of the patents only at the risk of infringing them. Although the restricted licenses have been cancelled, the defendant is still at a disadvantage in the sale of its casings. We find no fault on this account. It is the right of a patentee to withhold licenses if he sees fit to do so and to confine his patented methods to the manufacture of his own goods. Paper Bag Patent Case, Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122; Carbice Corp. v. American Patents Corp., 283 U.S. 420, 51 S.Ct. 496, 75 L.Ed. 1153. Any advantage accruing from this practice is not unlawful, but is attributable to the monopoly conferred by the patent statute. If the plaintiff had not granted illegal or restricted licenses in the first place, but had withheld licenses altogether, the improper conduct which has deprived it of a large measure of relief in the pending case would not have occurred.

Further, as to the period since April 3, 1941, the defendant charges that the plaintiff has violated the anti-trust acts by using its strategic position as the sole manufacturer of small frankfurter casings to induce purchasers thereof also to purchase from it their requirements of larger casings which are sold in competition with other manufacturers. But the evidence does not support the charge. The District Judge came to the conclusion that the plaintiff had not violated the anti-trust acts since May 12, 1941, and summed up the evidence on the point in the following passage from his supplemental memorandum opinion, with which we concur: "If the plaintiff's evidence is to be believed, it conclusively establishes that it is the policy of the executive officers of the plaintiff to no longer conduct its business in the manner which the court criticized. For the defendant there is credible evidence that certain salesmen in the employ of the plaintiff have attempted since April 3, 1941 to exercise coercion on certain sausage manufacturers to purchase their requirements of sausage casings from the plaintiff. There is no evidence that such coercive acts were done with the knowledge or approval of the plaintiff. It may be fairly said that insofar as such salesmen may be guilty of the conduct charged to them they disobeyed direct instructions given by their superior officers and acted contrary to a declared policy of the plaintiff. Upon a consideration of the whole evidence I am convinced that the plaintiff has carried the burden of showing that it has purged itself in good faith so as to entitle it to relief against one who is infringing its patents."

Finally the defendant objects to the dismissal of its counterclaim wherein it sought an injunction to restrain the plaintiff from the enforcement of the re-

spective provisions of its licenses and from continuance of practices in violation of the anti-trust law. The reasons for the dismissal of the counter-claim were set out in the following passage from the supplemental memorandum of the Judge, with which we concur: "The court having held that the plaintiff has established that it has in good faith discontinued its inequitable conduct, I am of the opinion that the defendant's counterclaim and amended counterclaim should be now dismissed. The court is satisfied that it is not likely that the plaintiff will resume such practices for the reason, if no other, that the relief to be granted the plaintiff will be dependent upon the plaintiff conducting its business and using its patents without creating a monopoly on unpatented materials. Under such circumstances the court in its discretion may refuse to grant an injunction for the reason that there is no need for one. Champion Spark Plug Co. v. Reich, 8 Cir., 121 F.2d 769, 50 U.S.P.Q. 417."

Summarizing our conclusions, we hold that the interlocutory decree of the District Court be modified so as to provide:

That the plaintiff is the owner of the patents in suit;

That claims 1, 2 and 3 of the Freund patent in suit, and all claims of the De-Cressey patent are invalid, and that the bill of complaint should be dismissed as to these patents;

That the supplemental answer be retained and that the bill of complaint be dismissed as to the Henderson and Dietrich patent without adjudicating the questions of invalidity and infringement thereof;

That all claims of the Hewitt patent are valid and have been infringed by the defendant;

That the defendant be restrained from further infringement of the Hewitt patent;

That the plaintiff completed its purge of its improper method of doing business and its improper use of the patents owned by it, including the patent in suit, on May 12, 1941, and that the plaintiff is entitled to an accounting from that date for the gains which the defendant has received and the damages which the plaintiff has suffered because of the defendant's infringement of the Hewitt patent;

That the relief granted the plaintiff by way of injunction and accounting be made dependent upon the future good conduct of the plaintiff and its officers and employees, as provided in the interlocutory decree of the District Court;

That the defendant's counterclaim be dismissed; and

That the costs in the District Court and in this court be divided equally between the parties to the cause.

Modified.